## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **Cobie J. Wells** | ) | |
| **Cristy Wells** | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | |
| | ) | **Cause No.**   1:14-cv-40 |
| **Select Portfolio Services, Inc.** | ) | |
| **Bank of America, N.A.** | ) | |
| | ) | |
| *Defendants* | ) | |

### COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL

Comes now, Plaintiffs, Cobie J. Wells and Cristy Wells (Collectively referred to as "Wells"), by counsel, and for their Complaint for Damages state and allege as follows:

### PARTIES

1.  Cobie J. Wells (Hereinafter "Mr. Wells") is a natural person domiciled in Union City, Randolph County, Indiana.

2.  Cristy Wells (Hereinafter "Mrs. Wells") is a natural person domiciled in Union City, Randolph County, Indiana.

3.  Bank of America, N.A. (Hereinafter "Bank of America") is a Foreign Financial Institution originating from North Carolina with headquarters in Charlotte, North Carolina. Bank of America is engaged in the business of lending and servicing consumer mortgages. Bank of America serviced the Mortgage loan at issue in this case: (1) from July 2011 or earlier until September 2012; and (2) October 2013 till present.

4.  Select Portfolio Servicing, Inc. (Hereinafter "SPS") is a for-profit foreign corporation originating from Utah with headquarters in Salt Lake City, Utah. SPS serviced the mortgage loan at issue in this case between September 2012 and October 2013.

## JURISDICTION

5. The Wells' Complaint alleges violations of several federal and state laws and/or regulations, including, but not limited to Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692p (FDCPA) and the Telephone Consumer Protection Act 47 U.S.C. § 227 (TCPA).

6. Federal and State Courts of Indiana have concurrent jurisdiction over Plaintiff's action brought under TCPA and FDCPA.

7. This Court has federal question subject matter jurisdiction over the TCPA claim alleged in this action pursuant to 28 U.S.C. § 1331. *Mims v. Arrow Financial Services, Inc.*, 132 S. Ct. 740 (Jan. 18, 2012).

8. This court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. Sec 1367.

9. Venue is proper because: a substantial portion of the events complained of occurred in the Northern District of Indiana; the Defendants conduct business in the Northern District of Indiana; and Plaintiffs reside in the Northern District of Indiana.

10. This court has diversity jurisdiction pursuant to 28 U.S.C. Sec. 1332 because the matter in controversy exceeds the sum or value of $75 000. Furthermore, the Defendants and Plaintiffs are residents of different states as required for Diversity Jurisdiction under 28 U.S.C. Sec. 1332 (a)(1).

   a. The primary place of business for Bank of America is Charlotte, North Carolina.

   b. The primary place of business for SPS is Salt Lake City, Utah.

   c. Both Plaintiffs reside in the Northern Judicial District of Indiana.

## FACTS

11.   Wells Fargo Bank, N.A., (Hereinafter "Wells Fargo") is a Foreign Financial Institution originating from California with headquarters in San Francisco, California. The alleged holders of the Promissory Note at issue in this case are the Certificate holders for Park Place Securities, Inc., Asset-Backed Pass-Through Certificates, Series 2005-WCW3. Wells Fargo is the trustee for said certificate holders of the Securitized Trust.

12.   On or about June 30th, 2005, Mr. Wells executed and delivered to Argent Mortgage Company, LLC. (Hereinafter "Argent") a Promissory Note (Hereinafter "Note") evidencing an obligation to pay the principal balance owed under the terms of the Note.

13.   On or about June 30th, 2005, Mr. Wells executed and delivered to Argent a Mortgage Agreement (Hereinafter "Mortgage") encumbering the Property commonly known as 618 W. Washington Street, Winchester, Indiana 47394 (Hereinafter "Property").

14.   The Mortgage was recorded on July 6th, 2005 as Instrument No. 20053186 in the records of Randolph County Recorder. The Mortgage was later assigned to Wells Fargo by an assignment recorded July 18th, 2007 as Instrument No. 20073190 of the records of Randolph County Recorder.

15.   In August 2011 Mr. Wells applied for and initiated a process to release Mr. Wells from his obligations under the Note in exchange for an assignment of deed to Wells Fargo (Hereinafter "Deed in Lieu").  Said Deed in Lieu was signed by the Wells on December 9th, 2011. Exhibit 1.

16.   On April 20th, 2012 Wells Fargo executed the Deed in Lieu and a Release and Satisfaction of Mortgage. Exhibit 1, Exhibit 2.

17.    The Deed in Lieu effectively released the Wells from any deficiencies and/or personal liabilities stemming from the Mortgage and Note. Exhibit 1.

18.    On October 10th, 2012 a General Warranty Deed was recorded with the Randolph County Recorder transferring all rights in the Property from the Wells to Wells Fargo. Exhibit 3.

19.    Despite the execution of the Deed in Lieu and the resulting release of all personal liability, the Wells were the subject of continuous harassment and debt collection attempts on the Mortgage and Note.

20.    In August, 2012, Mr. Wells received a letter from Bank of America dated August 28th, 2012 advising him that servicing of his Mortgage and Note will be transferred to a new servicer, SPS, beginning September 16th, 2012. Exhibit 4.

21.    Soon thereafter, the Wells started receiving written and telephonic communication from SPS in an attempt to collect on the Mortgage and Note.

22.    Mrs. Wells immediately spoke with an SPS representative advising him of the Deed in Lieu agreement between the Wells and Wells Fargo. The representative was dismissive of Mrs. Wells claims and asserted that she was incorrect and such mistakes do not happen.

23.    Following her phone conversation with the SPS representative (referred to in Paragraph 22 of this Complaint) Mrs. Wells contacted the attorney for Wells Fargo who she had previously come in contact with in regards to the Deed in Lieu. The attorney confirmed that the Deed in Lieu process was successfully completed and Mr. Wells had no outstanding personal liability on the Note and Mortgage. Mrs. Wells forwarded a copy of the Deed in Lieu to SPS via first class mail in the early part of 2013.  When SPS

continued to collect on the Mortgage and Note following this mailing, Mrs. Wells sent another copy of the signed Deed in Lieu on April 22nd, 2013 to SPS representative Sonia Custodio at (801) 270-7833 via fax.

24. Despite several attempts by the Wells to notifying SPS of the existing Deed in Lieu agreement, SPS continued to harass and annoy the Wells via phone calls and mail.

25. SPS in its attempt to collect on the Mortgage and Note made numerous phone calls to Mrs. Wells' cellular phone. Some if not all of these phone calls were made using an automatic telephone dialing system (Hereinafter "Automated Dialing System") as defined under the Telephone Consumer Protection Act and its underlying regulations (collectively referred to as "TCPA").

26. Phone calls made by SPS and answered by Mrs. Wells were threatening and harassing. During these phone calls, SPS representative would threaten to continue collection activity and to foreclose on the home unless the alleged delinquency was paid off.

27. On several occasions, Mrs. Wells attempted to or did explain to SPS representatives that the house at issue was vacated and the Wells' obligations under the Note and Mortgage were extinguished under the executed Deed in Lieu.

28. In response to the information provided by Wells that SPS was engaged in collecting a debt that wasn't owed, and her pleas for help, SPS representatives would simply read from a script and state that: SPS's records did not show a Deed in Lieu agreement; and the Wells needed to pay off the delinquency to avoid a foreclosure.  No SPS representative ever acknowledged what she was saying nor promised to review the file for inaccuracies or escalate the complaint lodged by the Wells to a supervisor or a representative with authority.

29. During the debt collection phone calls made by SPS to the Wells, SPS's representatives were often rude or degrading and made no real effort to help resolve the dispute. In fact one SPS representative went so far as to call Mrs. Wells a "liar". Others, who were less disrespectful did nothing to research and confirm the wrongfulness of the debt collection or refer the matter to a competent, authorized person for such work.  As mentioned previously, the Wells forwarded the executed copy of the Deed in Lieu agreement on several occasions to SPS. Said copies were forwarded following conversations between Mrs. Wells and SPS Representative, Sonia Custodio. SPS called the Wells numerous times even after the copy of the executed Deed in Lieu was forwarded to them on multiple occasions. During such phone calls, the Wells would notify SPS representatives about: (1) the Deed in Lieu agreement between Wells Fargo and the Wells; and (2) how an executed copy of the Deed in Lieu Agreement was forwarded to SPS representative Sonia Custodio. However, these notifications would fall on deaf ears as SPS representatives would continually claim to have no knowledge of either the existence of the Deed in Lieu or the receipt of an executed copy of the Deed in Lieu.

30. Upon information and belief representatives of SPS who are authorized to make or receive calls from borrowers are not adequately trained to receive, evaluate and determine the validity of borrower statements that SPS is collecting on amounts that are not owed. Also upon information and belief, SPS is not adequately staffed by personnel who can evaluate, research and respond to borrowers who are being subjected by SPS to wrongful collection actions. Instead, SPS appears to have made a calculated business

decision to disregard borrowers statements and to press for payment in all circumstances where the automated records show a balance due.

31.   SPS would often call Mrs. Wells cellular phone multiple times in a day and several days a week.

32.   Mrs. Wells believes that at least a few if not all of the calls made by SPS were autodialed because: (1) on several occasions Mrs. Wells was greeted by an automated voice when she answered the phone; and/or (2) calls made by SPS had a standard pause and gap before a live operator was available.

33.   Mrs. Wells did not provide any prior express consent for calls made to her cellular phone by SPS via an Automated Dialing System.

34.   All the calls alleged in this Complaint were made to Mrs. Well's current cellular phone number. Mrs. Wells did not have her current cellular phone number at the time the Note and Mortgage were originated. Furthermore, Mrs. Wells was not a party to the Mortgage and Note originally signed between Mr. Wells and Argent. Consequently, Mrs. Wells did not provide prior express consent for the automated calls she received from SPS.

35.   Mrs. Wells made repeated verbal requests for SPS to stop making calls to her cellular phone.

36.   Any alleged prior express consent that was provided was revoked once a Deed in Lieu was executed by both parties extinguishing any remaining debt and by Mrs. Well's affirmative act of verbally demanding for the calls to stop.

37.   SPS sent numerous written communications to the Wells. Said correspondence included (1) Mortgage Statements sent in an attempt to collect from and to provide updates to the Wells' of their alleged delinquent balance; and (2) Letters encouraging the Wells to

apply for a loan modification to avoid foreclosure. Said attempts include but are not limited to the following:

a.  Mr. Wells received a mortgage statement dated September 28th, 2012 from SPS claiming a past due amount of $12,870.02. Exhibit 5.

b.  Mr. Wells received a letter dated November 12, 2012 from SPS encouraging him to apply for a loan modification when the Property at issue: (1) was already vacated by the Wells; and (2) Title of the Property was already transferred to Wells Fargo. Exhibit 6.

c.  Mr. Wells received a letter dated November 16, 2012 from SPS notifying Mr. Wells of his alleged default. The letter urged Mr. Wells to cure the default by paying $15430.84 or SPS would be pursuing "remedies under the Security Instrument".. Exhibit 7

d.  Mr. Wells received a letter dated November 21, 2012 from SPS informing him that he had failed to apply for a loan modification as requested in SPS's November 12, 2012 letter. The letter also demanded Mr. Wells to immediately contact his assigned Relationship Manager, Sonia Custodio to "avoid losing his home". Exhibit 8.

e.  Mr. Wells received a mortgage statement dated December 17th, 2012 from SPS claiming a past due amount of $15,141.20. Exhibit 9.

f.  Mr. Wells received a mortgage statement dated February 12th, 2013 from SPS claiming a past due amount of $16,665.32. Exhibit 10.

g.  Mr. Wells received a mortgage statement dated March 15, 2013 from SPS claiming a past due amount of $17,412.38. Exhibit 11.

h.  Mr. Wells received a letter dated March 26, 2013 from SPS again encouraging him to apply for a loan modification to "avoid foreclosure". The letter also indicated that SPS had unsuccessfully tried to contact him on several different occasions via telephone. Exhibit 12.

i.  Mr. Wells received a letter dated April 6, 2013 from SPS informing him that his Relationship Manager has changed and advising him to contact his new Relationship Manager, Vernon McKinnon. Exhibit 13.

j.  Mr. Wells received a letter dated April 9, 2013 from SPS informing him that SPS had attempted to contact him several times via telephone to resolve his delinquent mortgage and he has options available to "resolve the default and avoid foreclosure". Exhibit 14.

k.  Mr. Wells received a mortgage statement dated April 16th, 2013 from SPS claiming a past due amount of $18,169.44. Exhibit 15.

l.  Mr. Wells received a letter dated May 10, 2013 from SPS informing him that he is not eligible for a loan modification as he chose to not participate and/or apply for the program. The letter advised him of alternatives like short sale or a deed in lieu Exhibit 16.

m.  Mr. Wells received a letter dated May 17, 2013 from SPS informing him of an adjustment in his monthly mortgage loan payment due to advanced property taxes or hazard insurance payments. Exhibit 17.

38.  Despite several efforts by the Wells to resolve the dispute the threatening phone calls and written communication alleging a delinquent Mortgage Account continued.

39. Furthermore, SPS falsely reported the Wells as delinquent on a mortgage obligation to the credit reporting agencies.

40. The Wells determined that communicating with SPS in hopes of a resolution was futile. The Wells had been unable to find anyone at SPS who would listen and adequately respond to them. They felt despair and hopelessness. The Wells decided to call Bank of America in a desperate effort to resolve this matter. The Wells made several phone calls to Bank of America, and were promised by several representatives that they would call SPS and update the Wells on their progress. However, no one called back.

41. It was now apparent to the Wells that Bank of America was indifferent towards their suffering and SPS was not interested in rectifying their records or even reviewing the Wells file to verify the alleged debt.

42. The Wells now decided to reach out and obtain legal counsel to resolve this matter. However, they were unable to find any counsel in their home town who was willing or able to adequately represent them. The local attorneys contacted by the Wells had limited knowledge of consumer protection laws and would often advise the Wells to call SPS and Bank of America or wait for the issue to resolve itself. Unfortunately, the Wells had already unsuccessfully tried both these approaches.

43. The Wells decided to: (1) file a complaint with the Attorney General's Office to stop the wrongful collection on or around early April 2013; and (2) contacted the office of the CEO of Bank of America to escalate their complaint.

44. Soon after the Wells filed a complaint with the Attorney General's Office, Mr. Wells received a letter dated April 17, 2013 from Bank of America acknowledging receipt of an inquiry dated April 15th, 2013 forwarded to Bank of America by the Consumer

Financial Protection Bureau CFPB. The letter promised to resolve Mr. Wells concerns or provide him with an update by April 30th, 2013. Exhibit 18. The inquiry received by Bank of America and dated April 15th, 2013 was likely the complaint filed by the Wells with the Indiana Attorney General's Office. As always Bank of America was non-compliant with its promise to resolve or update the Wells by April 30, 2013.

45.   On July 1, 2013, Mrs. Wells received an email from David M. Davis (Hereinafter "Mr. Davis"), a senior operational analyst at Bank of America. Mr. Davis asked Mrs. Wells if she needed "any assistance with her deed in lieu". Mrs. Wells spoke with Mr. Davis on the phone to provide him with details of her ongoing ordeal. On July 10, 2013 Mrs. Wells followed up on her phone conversation with Mr. Davis with an email. The following is a relevant excerpt from Mrs. Wells email to Mr. Davis dated July 10th, 2013:

    "I spoke with you last week about the issue with our complete deed in lieu being transferred to another mortgage company. Just wondering if you had any results in helping the situation. SPS has continued to call me every day since Saturday." Exhibit 19

46.   Following Mrs. Wells conversation and correspondence with Mr. Davis, SPS retracted its negative credit reporting and admitted that SPS was mistaken in its wrongful collection campaign. Mr. Wells received a verification letter dated August 23, 2013 from SPS acknowledging receipt of documents verifying the Deed in Lieu. The letter confirmed that the Wells account with SPS was updated and closed and a credit correction has been requested. Exhibit 20.

47.     Shortly thereafter, when the Wells checked their credit report they found that Bank of
        America was now reporting the account as: (1) "deferral, payments to begin July 2035";
        and (2) delinquent through and until September 2012.

48.     Utterly frustrated with the continuing wrongful collection, Mrs. Wells sent an email to
        several Bank of America representatives on August 19, 2013. The email pleaded for
        assistance in resolving this matter and detailed the specifics of their dispute. Exhibit 21.
        The following excerpt from this email captures the frustration of the Wells:
        "I don't know who else to call or who to contact  . . . We were so grateful when the
        process started. BAC was professional and seemed to be efficient in processing the deed
        in lieu. It was a heart breaking time for our family as we were leaving our family home,
        we didn't try for incentives, we did everything BAC asked for us in a timely manner, we
        were trying to stay positive that another family was going to be getting a beautiful home.
        But in actuality this has been nothing shy of a nightmare. . . . Our "fresh start" was
        merely the beginning of a huge nightmare and mistake that keeps getting traced bank to
        BAC."


49.     In response to the emails from Mrs. Wells (referred to in Paragraph 48 of this
        Complaint) Mr. Wells received a letter dated August 27th, 2013 from Bank of America.
        The letter also accepted that the inquiry received by Bank of America on August 19th,
        2013 constituted a Qualified Written Request under Section 6(e) of the Real Estate
        Settlement Procedures Act (RESPA). Exhibit 22. The letter from Bank of America dated
        August 27th, 2013 included no apology or promise to stop the continuing wrongful
        collection efforts by Bank of America and/or SPS.  The letter only promised to request a

deletion of the incorrect credit report trade line showing a deferral with payments re-starting in 2035. The tone of the letter was cold and dismissive of the suffering that the Wells had endured for the past several months. However, the Wells were happy to move on and   regained the hope and belief that they had finally been heard and that their concerns would be addressed. Their relief was short lived and any hope they had of an end to the wrongful collection disappeared when  Mr. Wells received an Account Statement dated October 22nd, 2013 from Bank of America showing a delinquent past due account. Exhibit 23.

50.     On or about October 27th, 2013, Mr. Wells also received a legal notice from Bank of America. The legal notice alleged that Mr. Wells was delinquent on his mortgage account and owed $98,393.72 as of October 18th, 2013. Exhibit 24. On and about October 27th, 2013, Mr. Wells also received a notice indicating the servicing of the Mortgage Account was transferred from SPS back to Bank of America.

51.     Mrs. Wells called Bank of America shortly after receiving the notices attached as Exhibit 23 and Exhibit 24. The Bank of America representative now claimed that the Mortgage and Note were a new account just recently transferred from SPS and denied any prior knowledge of the Deed in Lieu agreement. As usual the customer service was of no help and Mrs. Wells called the Office of the CEO of Bank of America. Shortly thereafter, Mrs. Wells received a call back from Mr. Davis, the representative who had dealt with her case prior to the account transfer from SPS to Bank of America. Mr. Davis was surprised at the continuing wrongful collection efforts and asked for 48-72 hours to investigate.

52. In a desperate attempt to resolve this matter, Mrs. Wells sent out several emails to representatives and employees of Bank of America between October 28th, 2013 and November 6th, 2013. The letters detailed the relevant facts of this dispute and again pleaded for assistance in resolving this matter and effectively ending this "nightmare" for her and her family. One such email dated October 29th, 2013 is attached as <u>Exhibit 25</u>. The following excerpt from this letter helps capture her and her family's frustration: "I am hopeful the situation will be rectified but I am reluctant to be so hopeful, considering that twice now I have been made to believe that it was all completed. However, it keeps coming back and I have to start from square one to get the situation resolved. . . . It is not fair or just that my family is enduring the stress and time consuming issues caused by mere miscommunication and lack of consideration." <u>Exhibit 25</u>

53. An acknowledgment of Mrs. Wells email attached as Exhibit 25 was received via a letter from Bank of America dated November 12th, 2013. The acknowledgment letter also promised that Mr. Wells will be informed of a proposed resolution by November 27th, 2013. <u>Exhibit 26.</u>

54. A final response to the Wells complaint received and acknowledged by Bank of America was received via a letter dated November 21st, 2013. The letter affirmed that Mr. Wells inquiry received by Bank of America will be treated as a Qualified Written Request under Section 6(e) of the Real Estate Settlement Procedures Act (RESPA). In response to the Wells inquiry regarding correspondence (legal notice and Account Statement attached as Exhibit 24 and 23 respectively)) received following Bank of America's earlier letter dated August 27th, 2013, the letter failed to provide any

justification and claimed that monthly mortgage statements and servicing change notices are automatically generated. Exhibit 27.

55.   The Wells have suffered actual damages as a result of Defendant SPS, Bank of America and Wells Fargo's actions. The actual damages include but are not limited to postage cost, value of time spent in an attempt to resolve this dispute by both Plaintiffs, cost of fuel and mileage incurred as a result of Defendants actions.

56.   The Wells have also incurred and suffered through significant emotional distress as a result of Defendant SPS, Bank of America and Wells Fargo's wrongful collection actions.

   n.   Mr. Wells is a chief of police for Union City, Indiana. He is a well-known community figure by virtue of his job in this small town in northern Indiana. Due to the wrongful collection efforts, threats and harassment, the Wells lived in constant fear of a foreclosure law suit against them. A foreclosure law suit against Mr. Wells would result  in public humiliation as well as possible loss of employment.

   o.   Mr. Wells job is highly stressful and the wrongful collection efforts exponentially increased his stress. Therefore, Mrs. Wells tried hard to shoulder the responsibility of resolving this dispute with the Defendants. Consequently, Mrs. Wells spent countless hours, on the phone, compiling letter and emails, researching harassment and debt collection laws, researching and meeting with local attorneys. However, despite her efforts, Mrs. Wells failed to stop the collection efforts from SPS and Bank of America. The situation was traumatizing for the Wells and especially frustrating for Mrs. Wells. Mrs. Wells would get frequent headaches and experience severe stress and anxiety as a direct result of the Defendants' actions.

57.     Upon knowledge and belief, Plaintiffs state that at the time SPS received servicing of the Mortgage and Note, the Mortgage Account was already in default as per Bank of America's records.

58.     Upon knowledge and belief, Plaintiffs state that at the time Bank of America re-acquired the servicing rights of the Mortgage and Note from SPS, the Mortgage Account was in default as per Bank of America's and SPS's records.

59.     Defendants' deceptive actions as described above were made knowingly or intentionally.

60.     Defendant, SPS engaged in  deceptive acts despite repeated notifications and attempts by the Wells when it: (1) misrepresented the status of the Wells Mortgage Account and Note to credit reporting agencies; (2) misrepresented the status of the Wells' Mortgage Account and Note to the Wells in several letters  including but not limited to those attached with this complaint; (3) misrepresented the status of the Wells' Mortgage Account and Note to the Wells during several harassing and annoying phone calls; and (4) attempted to collect a debt and threatened legal recourse for a debt not owed to it.

61.     Defendant, Bank of America engaged in  deceptive acts despite repeated notifications and attempts by the Wells when it: (1) misrepresented the status of the Wells Mortgage Account and Note to credit reporting agencies; (2) misrepresented the status of the Wells' Mortgage Account and Note to the Wells in several letters  including but not limited to those attached with this complaint; (3) misrepresented the status of the Wells' Mortgage Account and Note to the Wells during several phone conversations with the

Wells; and (4) attempted to collect a debt and threatened legal recourse for a debtnot owed to it.

<u>COUNT I: VIOLATION OF RESPA</u>

62.  Paragraphs 1 through 61 are re-alleged and incorporated by reference as though fully set forth herein.

63.  Real Estate Settlement Procedures Act (RESPA) contains a mechanism for consumers to obtain answers from their servicers to questions which they may have about their accounts and to obtain corrections to their account where appropriate.  12 U.S.C. § 2605(f).

64.  Defendant, Bank of America received correspondence from the Wells on August 19th, 2013. Bank of America in its letter dated August 27th, 2013 accepted that the correspondence received from the Wells on August 19th, 2013 constituted a Qualified Written Request under Section 6(e) of the Real Estate Settlement Procedures Act (RESPA). <u>Exhibit 22.</u>

65.  Defendant, Bank of America violated RESPA, 12 U.S.C. § 2605(e)(2)(B) and 12 U.S.C. § 2605(e)(2)(C), by failing to comply with the requisite statutory requirements including but not limited to providing the Wells with the information and documentation requested, or an explanation as to why the information sought was unavailable, no later than sixty (60) days after receipt of the Wells' Qualified Written Request.

66.  Defendant, Bank of America, violated RESPA, 12 U.S.C. § 2605(e)(2)(A) through its failure failing to comply with the requisite statutory requirements. Violations included failure to make appropriate corrections to the borrower's account after receipt of Mr. Wells' Qualified Written Request.

67.     Defendant, Bank of America, violated RESPA, 12 U.S.C. § 2605(e)(3), by providing information to consumer reporting agencies in violation of 12 U.S.C. § 2605(e)(3) following the receipt of Mr. Wells' Qualified Written Request.

68.     Upon information and belief, Defendant has engaged in the pattern or practice of non-compliance with the requirements of the mortgage servicer provisions of RESPA as set forth in 12 U.S.C. § 2605.

69.     The Wells suffered actual damages in the form of mental anguish and emotional distress as a result of Defendant's improper actions.

70.     The Wells suffered actual damages in the form of financial losses, including but not limited to postage cost, value of time spent in an attempt to resolve this dispute by both Plaintiffs, cost of fuel and mileage incurred as a result of Defendants actions.

WHEREFORE, the Wells requests that this Court declare that Defendant, Bank of America has violated RESPA, enjoin Defendant from committing any future violations of the Act, and award the Wells actual and compensatory damages, including those for mental anguish, in an amount to be determined at trial, statutory damages, attorney's fees and costs pursuant to 12 U.S.C. § 2605(f) and grant the Wells all other relief just and proper in the premises.

COUNT II: VIOLATION OF THE INDIANA HOME LOAN PRACTICES ACT

71.     Paragraphs 1 through 61are re-alleged and incorporated by reference as though fully set forth herein.

72.     The Indiana Home Loan Practices Act is codified at Ind. Code §§ 24-9-1 *et seq*.

73.     Throughout Defendants, Bank of America's and SPS's, interactions with the Wells, Defendants engaged in one or more deceptive acts, as defined by Ind. Code § 24-9-2-7, with respect to Mr. Wells' home loan, as defined by Ind. Code § 24-9-2-9.

74.     Ind. Code § 24-9-3-7(c)(3) prohibits persons from engaging in deceptive acts in connection with mortgage transactions.

75.     Through its actions, Defendants, Bank of America and SPS, violated the Indiana Home Loan Practices Act.

76.     The Wells suffered actual damages in the form of mental anguish and emotional distress as a result of Defendants, Bank of America's and SPS's, improper actions.

77.     The Wells suffered actual damages in the form of emotional distress damages and financial losses, including but not limited to postage cost, value of time spent in an attempt to resolve this dispute by both Plaintiffs, cost of fuel and mileage incurred as a result of Defendants, Bank of America's and SPS's,  actions.

78.     The Wells have filed, and there is currently pending, a Consumer Complaint against Defendants, Bank of America and SPS, with the office of the Attorney General of Indiana.   The Attorney General's Office has agreed to waive the 90 day waiting requirement and has informed the Plaintiff that they will not be pursuing the case. Exhibit 25.


WHEREFORE, the Wells pray that the court declare that Defendants' , Bank of America's and SPS's, actions werein violation of the Indiana Home Loan Practices Act, award the Wells actual, consequential, and statutory damages, as well as costs and reasonable attorney's fees, pursuant to Ind. Code § 24-9-5-4, and for all other relief just and proper in the premises

<u>COUNT III: FDCPA</u>

79.    Paragraphs 1-61 are re-alleged here and incorporated through reference as though fully

set forth herein.

80.    Defendants, Bank of America and SPS are "debt collectors" as defined by the FDCPA.

81.    Mr Wells and Mrs. Wells are "consumers" as defined by the FDCPA.

82.    Bank of America and SPS attempted to collect an alleged "debt" as defined by FDCPA.

Bank of America and SPS violated the FDCPA, 15 U.S.C. § 1692(d) when they engaged in

conduct the natural consequence of which was to harass, oppress and abuse the Plaintiffs in

connection with the collection of a debt which was not due or owed to them.

83.    Bank of America and SPS violated the FDCPA, 15 U.S.C. § 1692(e) including its

subdivisions when they used false, deceptive or misleading representations to collect a

debt not due or owed to them.


84.    Bank of America and SPS violated the FDCPA, 15 U.S.C. § 1692(f) including its

subdivisions when they used unfair or unconscionable means to collect or attempt to

collect a debt not due or owed to them.

85.    The Wells incurred Actual Damages as a result of Bank of America and SPS's violations

including but not limited to emotional distress, postage cost, value of time spent in an

attempt to resolve this dispute by both Plaintiffs, cost of fuel and mileage incurred as a

result of Defendants actions.


**WHEREFORE**, the Wells requests that the Court declare that Bank of America and SPS

violated FDCPA, enjoin Bank of America and SPS from committing any future violations of the

FDCPA, and award the Wells actual and compensatory damages, including those for mental

anguish, in an amount to be determined at trial, statutory damages, attorney's fees and costs pursuant to 15 U.S.C. § 1692(k) and grant the Wells all other relief the court deems to be just and proper.

## COUNT IV: TCPA

86.     Paragraphs 1-61are re-alleged here and incorporated through reference as though fully set forth herein.

87.     The TCPA prohibits the use of any "automatic telephone dialing systems" to call cellular telephones.

88.     "Automatic telephone dialing system" means any equipment that has the "*capacity* to dial numbers without human intervention."  *Griffith v. Consumer Portfolio Serv., Inc.*, 2011 WL 3609012 (N.D.Ill. Aug. 16, 2011)(emphasis original).

89.     Defendant, SPS, called Mrs. Wells' cellular telephones using an Automated Dialing System.

90.     SPS did not have prior express consent for such calls.

91.     SPS violated TCPA §227(b)(1)(A)(iii) by placing calls via an Automated Dialing System to Mrs. Wells' cellular phone device.

92.     SPS's violations were negligent, or alternatively, they were willful. 47 U.S.C. §312(f)(1).

**WHEREFORE,** Mrs. Wells requests that the Court enter judgment in favor of her and against SPS that provides the following relief:

a.      Statutory damages granted by the TCPA;

b.      An injunction prohibiting SPS from placing future calls to Mrs. Wells' cellular phone using an automatic telephone dialing system and/or a prerecorded voice message without his prior express consent.

c.      Any other relief the Court finds just and proper.

### COUNT V: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

93.    Paragraphs 1 through 61 are re-alleged and incorporated by reference as though fully set forth herein.

94.    Defendants Bank of America and SPS, intentionally or recklessly engaged in extreme and outrageous conduct.

95.    Said conduct was beyond all possible bounds of decency, was atrocious and utterly intolerable in a civilized society.

96.    Defendants, Bank of America and SPS, intentional or reckless conduct caused severe emotional distress to the Wells.

97.    Defendants, Bank of America and SPS, acted with gross negligence.

**WHEREFORE**, the Wells pray that judgment be entered against Bank of America and SPS for: emotional distress suffered by the Wells because of Bank of America's and SPS's conduct resulting in Intentional Infliction of Emotional Distress, for punitive damages, and for all other relief just and proper in the premises.

### COUNT VI: INTRUSION UPON SECLUSION

98.   Paragraphs 1 through 61 are re-alleged and incorporated by reference as though fully set forth herein.

99.   Defendants, Bank of America and SPS, intentionally interfered with or intruded into the Wells solitude or seclusion.

100.   Defendants', Bank of America's and SPS's, were highly offensive to the Wells and would be highly offensive to a reasonable man.

101.   Defendants', Bank of America's and SPS's, conduct constitutes an intentional interference with the Wells interest in solitude or seclusion.

102.   The Wells incurred Actual Damages as a result of Bank of America and SPS's actions including but not limited to emotional distress, postage cost, value of time spent in an attempt to resolve this dispute by both Plaintiffs, cost of fuel and mileage incurred as a result of Defendants actions.

103.   Defendants, Bank of America and SPS, acted with gross negligence.

**WHEREFORE**, the Wells pray that judgment be entered against Bank of America and SPS for actual damages including emotional distress suffered by the Wells because of Bank of America's and SPS's conduct violating the Wells interest in solitude or seclusion, for punitive damages, and for all other relief just and proper in the premises.

## COUNT VII: INDIANA CRIME VICTIM'S RELIEF ACT

111.   Paragraphs 1 through 61 are re-alleged and incorporated by reference as though fully set forth herein.

112.   IC 34-24-3-1 provides civil remedy for violation of criminal code provision IC 35-43.

113.     The Wells have suffered a pecuniary loss as a result of defendants', Bank of America's and SPS's, violation of IC 35-43.

114.     Defendants, Bank of America and SPS, knowingly or intentionally made a false or misleading written statement with intent to obtain property from the Wells in violation of IC **35-43-5-3.**

115.     The Wells incurred Actual Damages as a result of Bank of America and SPS's actions including but not limited to emotional distress, postage cost, value of time spent in an attempt to resolve this dispute by both Plaintiffs, cost of fuel and mileage incurred as a result of Defendants actions.

**WHEREFORE**, the Wells pray that judgment be entered against Bank of America and SPS for all damages permissible under IC 34-24-3-1 including but not limited to actual damages including out of pocket losses and expenses, emotional distress, treble damages, attorneys' fees, costs and for all other relief just and proper in the premises.

Respectfully Submitted,

/s/Syed Ali Saeed
Saeed & Little, LLP
Syed Ali Saeed ## 28759-49
1433 N. Meridian St. (Ste 202)
Indianapolis, IN 46202
Phone #: (317) 614-5741
Email: Ali@SLLawfirm.com
Fax: (888)-422-3151

## DEMAND FOR TRIAL BY JURY

Come now the Defendant, by counsel, and requests a trial by jury on all issues deemed so triable.

Respectfully submitted,

/s/ Syed Ali Saeed
Saeed & Little, LLP
Syed Ali Saeed ## 28759-49
1433 N. Meridian St. (Ste 202)
Indianapolis, IN 46202
Phone #: (317) 614-5741
Email: Ali@SLLawfirm.com
Fax: (888)-422-3151

## VERIFICATION

I, Cristy Wells, verify, under penalty of perjury, that the facts contained in the foregoing Verified Complaint are true and correct to the best of my knowledge, information and belief.

Respectfully submitted,

/s/ Cristy N. Wells
Cristy Wells

I, Cobie J. Wells, verify, under penalty of perjury, that the facts contained in the foregoing Verified Complaint are true and correct to the best of my knowledge, information and belief.

Respectfully submitted,

/s/ Cobie J. Wells
Cobie J. Wells